UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                   :

SARAH SCHOTTENSTEIN,         :

            Plaintiff,          :

        - against -          :

STEVEN SCHOTTENSTEIN; M/I    :
HOMES, INC.; and DOES I through X,   :

        Defendants.          :

                                     :
------------------------------------------------------X

**OPINION & ORDER**

**04 Civ. 5851 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

       Sarah Schottenstein ("Sarah") brings this action against her father, Steven Schottenstein ("Mr. Schottenstein") and his employer, M/I Homes, Inc. ("M/I Homes") (collectively, "defendants"), alleging, *inter alia*, false imprisonment, invasion of privacy, intentional infliction of mental and emotional distress, and conversion.[1]  Mr. Schottenstein and M/I Homes have filed separate

---

      [1]       Specifically, the Amended Complaint ("Am. Compl.") sets forth the following causes of action:  (1) false imprisonment; (2) invasion of privacy; (3) violation of the Fourteenth Amendment based on Mr. Schottenstein's purported decision to "lock[] up" Sarah in the Cross Creek prison compound in Utah; (4) violation of the Eighth and Fourteenth Amendments premised on defendant's "enlisting the Ohio courts to lock Sarah [] up in Utah and Kansas, and to deprive her of [her mother's] company; (5) intentional infliction of mental and emotional distress; and (6) conversion, restitution, and accounting.  Sarah is also petitioning for habeas corpus relief, challenging Mr. Schottenstein's custody of her two younger sisters.  Am. Compl. ¶¶ 25-46.  According to the Amended Complaint,

motions seeking to dismiss the Amended Complaint on grounds that include: lack of subject-matter and personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted.[2]  For the reasons that follow, M/I Homes's motion to dismiss is granted and Mr. Schottenstein's motion to dismiss is granted in part and denied in part.

## I.    BACKGROUND

### A.    The Parties

Sarah is a New York citizen who has lived with her mother, Jill Schottenstein (Mr. Schottenstein's ex-wife), since she reached the age of majority on February 8, 2004.[3]  Mr. Schottenstein is a citizen of Ohio and the Chief Operating Officer and Vice Chairman of M/I Homes, a homebuilding company with its principal place of business in Columbus, Ohio.[4]

---

jurisdiction is premised on both diversity of citizenship and federal question grounds. *See id.* ¶ 6 (citing 28 U.S.C. §§ 1331, 1332(a)(1)).

[2]    *See* Fed. R. Civ. P. 12(b)(1)-(3), (6), *cited in* 8/23/04 Notice of Motion to Dismiss Filed by M/I Homes ("M/I Homes Notice of Motion") and 8/20/04 Notice of Motion to Dismiss Filed by Mr. Schottenstein.

[3]    *See* Am. Compl. ¶ 15.

[4]    *See id.* ¶¶ 7-8, 12; 8/18/04 Affidavit of J. Thomas Mason, Senior Vice President, General Counsel, and Secretary of M/I Homes, in Support of M/I Homes's Motion to Dismiss ("Mason Aff."), annexed to M/I Homes Notice of Motion, ¶ 1.

**B.    Facts**

The origins of this lawsuit can be traced to January 29, 1998, when

Jill Schottenstein filed for divorce.  Sarah alleges that Mr. Schottenstein "regarded

Jill's rejection and divorce as a personal insult.  In retaliation, he decided to make

Jill Schottenstein pay where it hurt most, by depriving her of her daughters."[5]

Custody of Sarah and her younger sisters Ashley and Abbey was awarded to Mr.

Schottenstein and Mrs. Schottenstein was permitted visitation rights.[6]

Mrs. Schottenstein and her children appealed from the Decree of

Divorce and various orders of contempt against Mrs. Schottenstein relating to

visitation and interference with custody.[7]  The Ohio Tenth District Court of

Appeals affirmed the trial court on "all financial issues, however, the [court]

reversed the prior findings of contempt against [Mrs. Schottenstein], and

remanded the matter to the trial court to take new evidence on intervening events

---

[5]        Am. Compl. ¶ 17.

[6]        *See* 1/29/04 Decision and Order (Court of Common Pleas of Franklin
County, Ohio, Division of Domestic Relations) ("Final Custody Order"), Ex. A to
Mr. Schottenstein's Memorandum of Law in Support of His Motion to Dismiss
("Schottenstein Mem."), at 1.  Ashley and Abby are seventeen and fifteen,
respectively. *See* Am. Compl. ¶ 15.  The Schottensteins's Decree of Divorce was
filed on January 8, 2001. *See* Final Custody Order at 2.

[7]        *See* Final Custody Order at 2.

and to re-interview the children."[8]  The case was then continued for a year, during

which Mr. Schottenstein filed for and obtained an Order of Civil Protection

against Mrs. Schottenstein, who was found to have engaged in domestic violence

against her daughters.  The trial court then awarded sole custody to Mr.

Schottenstein, permitting Mrs. Schottenstein supervised visitation with her

children.

Sarah claims that while she was in the custody of Mr. Schottenstein,

he used the M/I Homes aircraft to take "[her] against her will and without her

consent to Connecticut to be enrolled at Suffield Academy, where [she] suffered

several health problems."[9]  Sarah avers that Mr. Schottenstein later took her to

Utah and placed her in Cross Creek Manor, a "highly punitive lock-down facility

housing serious drug offenders and badly behaving girls."[10]  Jill Schottenstein

"traced the M/I Homes jet" to Utah, prompting Mr. Schottenstein to move Sarah to

a mental hospital in Kansas.[11]

-------------------------------------------------

[8]      *Id.*  Sarah avers that she and her sisters were "initially muffled by the
trial court, but later, when allowed after appeal to express their preference for their
mother, saw that preference cavalierly disregarded."  *See* Am. Compl. ¶ 18.

[9]      Am. Compl. ¶ 19(d).

[10]     *Id.* ¶ 19(e).

[11]     *Id.* ¶ 19(f).

In February of this year, Sarah turned eighteen and left her father's house to live with her mother, who had moved to New York in 2002. Within five months, Sarah filed the instant lawsuit.

## C.    The Amended Complaint

Sarah sets forth seven causes of action in her complaint.[12] *First*, she asserts a claim for false imprisonment premised on her father's decision to place her in the Suffield Academy, a Utah prison camp, and a psychiatric hospital.[13]

------

[12]    I note that, as drafted, these claims relate only to Sarah's father. Indeed, Sarah unfailingly uses the singular for "defendant" when setting forth her many claims, and the allegations make it quite clear that the complained-of conduct was undertaken by her father, not M/I Homes. However, with the exception of her petition for habeas relief, *see* Plaintiff's Memorandum of Law in Opposition to M/I Homes's Motion to Dismiss ("Pl. M/I Homes Opp.") at 13 ("Sarah made no claim for habeas corpus against M/I Homes"), Sarah is bringing these claims against both defendants. She contends that she has asserted these causes of action against M/I Homes because:

> it has been the chief means of support and a willing tool by which Sarah's father has been able to abuse her. M/I Homes has breached its fiduciary obligations to its shareholders, including Sarah, by supporting its chief executive in abusing Sarah and her sisters. Yet, it still will not now, for the sake of its shareholders and Sarah, persuade Mr. Schottenstein not to carry on his vindictive actions against his own daughters, who simply want to leave.

*Id.* at 2.

[13]    *See* Am. Compl. ¶ 25.

*Second*, she claims invasion of privacy, alleging that her father disrespected "boundaries that she had a right, as an individual, to expect and maintain regardless of her minority status" by, among other things, entering her room without her permission, monitoring her telephone calls, and "using her as an object to punish her mother."[14] *Third*, she alleges intentional infliction of emotional distress because her father used his "power to influence Ohio courts and witnesses" to keep Sarah and her mother apart, in an alleged attempt to "deliberate[ly] and outrageous[ly] . . . punish his wife for leaving him and his daughter for her allegiance to [her mother] and not to him."[15] *Fourth*, Sarah claims conversion premised on her belief that Mr. Schottenstein has control over accounts and trusts for which she is the beneficiary and that he has converted some of the funds for his own profit, for which she seeks restitution and an accounting.

   *Fifth*, she asserts a violation of the Fourteenth Amendment, based on the Ohio court's custody order that purportedly deprived her of her "liberty and privacy interests by forcing her to live away from her mother whom she adores and to be locked up [in Utah and Kansas]" in violation of her right to "substantive

---

[14]     *Id.* ¶ 29.

[15]     *Id.* ¶ 39 (mislabeled in the Amended Complaint as paragraph 29).

due process of law."[16] *Sixth*, she claims that her father violated the Eighth and

Fourteenth Amendments by "locking [her] up in Utah and Kansas, and [depriving]

her of [her mother's] company, comfort and care, without procedural or

substantive due process of law."[17] *Seventh*, she petitions for habeas corpus relief

on behalf of her sisters.[18]

Sarah seeks compensatory and punitive damages, the restitution of

funds and securities allegedly converted by Mr. Schottenstein and an accounting

of funds and securities held in her name or for her benefit, and "immediate

production of Ashley and Abby . . . at their mother's residence in New York

City."[19]

### D.    Jurisdictional Allegations

#### 1.    Mr. Schottenstein

##### a.    Financial Transactions

Sarah asserts that two days before her eighteenth birthday, Mr.

Schottenstein "got the Ohio court to transfer Sarah's 'gift to minors money' from

---

[16]    *Id.* ¶ 32.

[17]    *Id.* ¶ 36.

[18]    *See id.* ¶¶ 44-46.

[19]    *Id.* Prayer for Relief.

her mother's custody to himself so that Sarah would have no money for college in

New York and would have to return to him."[20]  Additionally, the opposition brief

contains various unsworn statements indicating that Mr. Schottenstein, through a

New York brokerage firm, Salomon Smith Barney, sold $400,000 of securities that

belonged to her.[21]  He then "refused to return the proceeds for the stock sale to

---

[20]    *Id.* ¶ 3.  *See also id.* ¶ 23 ("Sarah needs money for college and
expenses in New York.  Sarah sought to access her own funds that should have
been available to her as an adult. [Mr. Schottenstein], however, two days before
Sarah's 18th birthday, removed both cash and stock from her access and control,
leaving her destitute for college tuition and expenses.").  Specifically, Sarah
claims that Mr. Schottenstein "had his benefactor Judge Jim Mason of the Ohio
Court of Common Pleas in Franklin County, Ohio, authorize Mr. Wolinetz to
transfer by Brad Kastan at Paine Webber in New York, out of Jill Schottenstein's
custodianship in New York for Sarah under the Ohio Uniform Transfer to Minors
Act, over $13,000 and put it in his own name."  Plaintiff's Memorandum of Law
in Opposition to Mr. Schottenstein's Motion to Dismiss ("Pl. Schottenstein Opp.")
at 6.  Apparently, the court order relating to these funds was issued following a
hearing during which the court requested Jill Schottenstein's appearance.  Her
failure to appear has resulted in an outstanding bench warrant for her arrest.  *See
id.*

[21]    This is supported, in part, by Sarah's declaration, in which she states
that in a letter from her father, he "did not offer [her] the $400,000 proceeds from
[her] M/I stock sold in May, 2004."  9/6/04 Declaration of Sarah Schottenstein in
Opposition to M/I Homes's Motion to Dismiss ("Sarah Dec.") ¶ 8.  She further
states, "I do not know whether or not my father was a trustee or custodian of this
stock, whether the sale proceeds are still impressed with a trust, if any, where the
proceeds are, where the trust documents, if any, are, or under what terms I am
entitled to the proceeds, or whom I should contact."  *Id.*

[her] in New York, or to tell her where the proceeds are."[22]  Sarah further contends that Mr. Schottenstein "regularly and recently has sold a considerable number of shares in his own company, M/I Homes, which is listed on the New York Stock Exchange, resulting in substantial revenue."[23]

### b.    Interference with Health Care

Sarah further alleges that her father interfered with the medical care that she was receiving in New York pursuant to her mother's Aetna health insurance plan.  In particular, she avers that after Aetna informed Mr. Schottenstein of Sarah's medical history, "M/I Homes . . . changed its health insurance from Aetna to another carrier with Sarah listed as a beneficiary so that Sarah would be forced to use a carrier accessible to her father, and allowing Aetna to cap its coverage due to another carrier's being involved."[24]

### c.    Correspondence with Sarah

---

[22]    Pl. Schottenstein Opp. at 6.  I will consider jurisdictional allegations presented in the briefs, but absent from the declaration, affidavits, and Amended Complaint.  I note, however, that unsworn statements proffered by counsel in the briefs are generally disfavored relative to statements made in affidavits and other forms of evidence. *Cf. Markowitz Jewelry Co. v. Chapal/Zenray, Inc.*, 988 F. Supp. 404, 407 (S.D.N.Y. 1997); *Jimenez v. Mobil Oil Co. de Venezuela*, No. 90 Civ. 5938, 1991 WL 64186, at *3 (S.D.N.Y. Apr. 18, 1991).

[23]    Pl. Schottenstein Opp. at 6.

[24]    Am. Compl. ¶ 22.

Finally, Sarah submits that Mr. Schottenstein "purposefully directed his activities toward [her], a resident of New York State."[25]  In particular, he has purportedly sent and continues to send e-mail messages, letters, and Airborne deliveries "after commencement of this case without going through her retained counsel."[26]

### 2.    M/I Homes

#### a.    Company Website

In her opposition papers, Sarah claims that M/I Homes

> maintains an interactive website that targets New York state residents for its Orlando, Tampa, and West Palm Beach Florida home and financing products.  It engages prospective buyers, including those in New York into sampling its wares; expressing their needs of home types and location, including three locations in Florida.  It engages them in interactive participation so that they will know the level of home they can afford through Schottenstein financing.[27]

Sarah further argues that M/I Homes "makes and solicits millions of dollars of sales, [] serves the New York market, [] targets New York consumers through electronic advertising, [] sells large numbers of homes to New York customers,

---

[25]    Pl. Schottenstein Opp. at 7.

[26]    *Id.  See also* Sarah Dec. ¶ 7.

[27]    Pl. M/I Homes Opp. at 6.  *See also* Sarah Dec. ¶¶ 3-4.

-10-

and [] maintains ongoing contacts with New York customers who register on its web site and have interest in M/I Homes' products in Florida."[28]

### b.    New York Customers

Sarah further contends that "a minimum of 20% of M/I Homes [*sic*] revenue comes from the sale of lots, homes, upgrades, and or financing to New York residents, much of it by way of M/I Homes [*sic*] internet website."[29]

## II.    APPLICABLE LAW

### A.    Legal Standards

#### 1.    Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."[30]  When the defendant challenges the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff.[31]

---

[28]    Pl. M/I Homes Opp. at 8.

[29]    Sarah Dec. ¶ 5.

[30]    *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

[31]    *See Robinson v. Government of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001).

However, "where evidence relevant to the jurisdictional question is before the court, 'the district court . . . may refer to [that] evidence.'"[32] Therefore, "[i]n resolving the question of jurisdiction, the [] court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."[33] The consideration of materials extrinsic to the pleadings does not convert the motion into one for summary judgment.[34]

### 2.    Rule 12(b)(2)

Upon motion, a court is obligated to dismiss an action against a defendant over which it lacks personal jurisdiction.[35] A plaintiff bears the ultimate burden of establishing, by a preponderance of the evidence, that the court has jurisdiction over the defendant.[36] However, "[p]rior to discovery, a plaintiff

---

[32]    *Id.* (alterations in original) (quoting *Makarova*, 201 F.3d at 113).

[33]    *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002).

[34]    *See CCS Int'l Ltd. v. United States*, No. 03 Civ. 507, 2003 WL 23021951, at *2 (S.D.N.Y. Dec. 24, 2003).

[35]    *See* Fed. R. Civ. P. 12(b)(2); *see also In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000 (Kaprun Siemens Austria)*, 230 F. Supp. 2d 403, 406 (S.D.N.Y. 2002) ("*Kaprun Siemens Austria*").

[36]    *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 & n.3 (2d Cir. 1994).

-12-

challenged by a jurisdiction testing motion may defeat the motion by pleading in

good faith . . . legally sufficient allegations of jurisdiction, i.e., by making a *prima*

*facie* showing of jurisdiction."[37]  A plaintiff "can make this showing through his

own affidavits and supporting materials[,] containing an averment of facts that, if

credited . . . , would suffice to establish jurisdiction over the defendant."[38]  Thus, a

court may consider materials outside the pleadings,[39] but must credit the plaintiff's

averments of jurisdictional facts as true.[40]  "[W]here the issue is addressed on

affidavits, all allegations are construed in the light most favorable to the plaintiff

and doubts are resolved in the plaintiff's favor, notwithstanding a controverting

presentation by the moving party."[41]  Nonetheless, where a defendant "rebuts [a

plaintiff's] unsupported allegations with direct, highly specific, testimonial

---

[37]     *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998)
(quotation marks and citations omitted).  *See also Koehler v. Bank of Berm., Ltd.*,
101 F.3d 863, 865 (2d Cir. 1996).

[38]     *Whitaker v. American Telecasting Inc.*, 261 F.3d 196, 208 (2d Cir.
2001) (quotation marks and citations omitted).

[39]     *See Hsin Ten Enter. USA, Inc. v. Clark Enters.*, 138 F. Supp. 2d 449,
452 (S.D.N.Y. 2000).

[40]     *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560,
567 (2d Cir. 1996).

[41]     *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).
*See also Whitaker*, 261 F.3d at 208.

-13-

evidence regarding a fact essential to jurisdiction — and [the] plaintiff[] do[es] not counter that evidence — the allegation may be deemed refuted."[42]

### 3.    Rule 12(b)(6)

"Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations.'"[43]  Thus, a plaintiff need only plead "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[44]  Simply put, "Rule 8 pleading is extremely permissive."[45]

At the motion to dismiss stage, the issue "'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleading that a

---

[42]    *Schenker v. Assicurazioni Genereali S.p.A., Consol.*, No. 98 Civ. 9186, 2002 WL 1560788, at *2 (S.D.N.Y. July 15, 2002).

[43]    *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (emphasis added) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

[44]    *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)).

[45]    *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004).

-14-

recovery is very remote and unlikely but that is not the test.'"[46]

The task of the court in ruling on a Rule 12(b)(6) motion is "'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"[47] When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor.[48]

## B.    Subject-Matter Jurisdiction

### 1.    Domestic Relations Exception

The Supreme Court has explained that the domestic relations exception "'divests the federal courts of power to issue divorce, alimony, and child custody decrees.'"[49] Such a rule serves various policy considerations, such as (1)

---

[46]    *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002) (per curiam) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)).

[47]    *Pierce v. Marano*, No. 01 Civ. 3410, 2002 WL 1858772, at *3 (S.D.N.Y. Aug. 13, 2002) (quoting *Saunders v. Coughlin*, No. 92 Civ. 4289, 1994 WL 98108, at *2 (S.D.N.Y. Mar. 15, 1994)).

[48]    *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[49]    *Elk Grove Sch. Dist. v. Newdow*, 124 S. Ct. 2301, 2309 (2004) (quoting *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992)). *See also Williams v. Lambert*, 46 F.3d 1275, 1283 (2d Cir. 1995). This language suggests that the domestic relations exception relates to both diversity and federal question jurisdiction. However, the Second Circuit has stated that "the matrimonial exception to federal jurisdiction is not based on Article III of the Constitution but

-15-

judicial economy, *i.e.*, "state courts are more eminently suited to work of this type

than are federal courts, which lack the close association with state and local

government organizations dedicated to handling issues that arise out of conflicts

over divorce, alimony, and child custody decrees," and (2) judicial expertise, *i.e.*,

"it makes far more sense to retain the rule that federal courts lack power to issue

these types of decrees because of the special proficiency developed by state

tribunals . . . in handling issues that arise in the granting of such decrees."[50]

     This exception is "very narrow" and is not intended to "strip the

federal courts of authority to hear cases arising from the domestic relations of

persons unless they seek the granting or modification of a divorce or alimony

decree, or a child custody decree."[51] Accordingly, claims arising in the domestic

---

is instead an interpretation of the diversity statute." *Id. See also Elk Grove Sch. Dist.*, 124 S. Ct. at 2314 (Rehnquist, J., concurring) (noting that the exception "is a limiting construction of the statute defining federal diversity jurisdiction").

[50]    *Ankenbrandt*, 504 U.S. at 704.

[51]    *Williams*, 46 F.3d at 1283 (quotation marks and citations omitted). *See also, e.g., Dunn v. Cometa*, 238 F.3d 38, 41 (1st Cir. 2001) ("Despite the breadth of the phrase 'domestic relations exception' and the potential reach of the exception's aim, *Ankenbrandt* made clear that the exception is narrowly limited. In general, lawsuits affecting domestic relations, however substantially, are not within the exception unless the claim at issue is one to obtain, alter or end a divorce, alimony or child custody decree."). Nonetheless, at least one court in this district held that the exception applies to claims that "involve" but do not seek issuance or modification of a custody decree. *Durr v. Mobley*, No. 92 Civ. 8349,

-16-

relations context, but sounding in tort or contract, or alleging civil rights violations ordinarily fall outside the ambit of the domestic relations exception.[52]

Nonetheless, it might be "appropriate for the federal courts to decline to hear a case involving elements of the domestic relationship, even where

---

1993 WL 118486, at *2 (S.D.N.Y. Apr. 12, 1993).

[52]    *See, e.g.*, *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 190 n.6 (1997) (Ginsburg, J., dissenting)  ("[C]laims of a kind traditionally adjudicated in federal courts, for example, tort or contract claims, are not excepted from federal-court jurisdiction simply because they arise in a domestic relations context."); *Ankenbrandt*, 504 U.S. at 706 (declining to apply the domestic relations exception to diversity jurisdiction in a suit where "a former spouse sues another on behalf of children alleged to have been abused"); *Minot v. Eckardt-Minot*, No. 92 Civ. 3334, 1993 WL 106043, at *1 (S.D.N.Y. Apr. 6, 1993) ("An examination of *Barber* [*v. Barber*, 62 U.S. 582, 584 (1859)] and Article III of the Constitution makes clear that the Constitution does not exclude domestic relations cases from the jurisdiction otherwise granted by statute to the federal courts. . . . Here, plaintiff sues in tort and alleges violation of his civil rights. Therefore federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332 is proper in this case."), *aff'd*, 13 F.3d 590 (2d Cir. 1994); *United States v. Nichols*, 928 F. Supp. 302, 317 (S.D.N.Y. 1996) ("[T]his exception [does not] preclude a federal court sitting in diversity from hearing a tort claim for personal injury brought by a child for injury inflicted by a parent."), *aff'd*, 113 F.3d 1230 (2d Cir. 1997) (unpublished table decision); *McArthur v. Bell*, 788 F. Supp. 706, 708 (E.D.N.Y. 1992) ("Federal courts do have jurisdiction to decide tort, contract or civil rights questions in cases arising out of a domestic relations context when the underlying domestic relations issues are not in dispute.") (citing cases); *Tilley v. Anixter Inc.*, 283 F. Supp. 2d 729, 736 (D. Conn. 2003) ("[S]everal courts have ruled that claims for intentional infliction of emotional distress instituted by a spouse against a former spouse do not fit within the domestic relations exception.") (citing cases).

divorce, alimony, or child custody is not strictly at issue."[53]

> This would be so when a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." Such might well be the case if a federal suit were filed prior to effectuation of a divorce, alimony, or child custody·decree, and the suit depended on a determination of the status of the parties.[54]

### 2.    Rooker-Feldman Doctrine

The "Rooker-Feldman doctrine" acknowledges that "Congress's grant to federal district courts of jurisdiction to entertain suits raising federal questions . . . is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to the United States Supreme Court."[55]  Thus, "federal district courts do not have jurisdiction over claims that have already been decided, or that are 'inextricably intertwined' with issues that have already been decided, by a state

---

[53]     *Elk Grove Unified Sch. Dist.*, 124 S. Ct. at 2309 (quotation marks and citation omitted).

[54]     *Id.* (quoting *Ankenbrandt*, 504 U.S. at 705-06).

[55]     *Mitchell v. Fishbein*, 377 F.3d 157, 165 (2d Cir. 2004) (quotation marks and citations omitted).  *See generally District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).

court."[56]

The Second Circuit has counseled that "'inextricably intertwined' means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding . . . , subsequent litigation will be barred under the Rooker-Feldman doctrine if it would be barred under principles of preclusion."[57] Accordingly, where a lawsuit or claim would be barred in state court by either res judicata or collateral estoppel, Rooker-Feldman prevents the federal court from asserting subject-matter jurisdiction.[58] Under the doctrine of res judicata, or claim preclusion, a party is barred from litigating a claim more than once.[59]

> Under general principles of collateral estoppel, or issue preclusion, a judgment in a prior proceeding bars a party and its privies from relitigating an issue if, but only if: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a

---

[56] *Mitchell*, 377 F.3d at 165 (quoting *Bridgewater Operating Corp. v. Feldstein*, 346 F.3d 27, 29 (2d Cir. 2003) (per curiam), *cert. denied*, *Ulysses I & Co., Inc. v. Feldstein*, No. 03 Civ. 1546, 2004 WL 2050486 (Oct. 4, 2004)).

[57] *Vargas v. City of New York*, 377 F.3d 200, 205 (2d Cir. 2004) (quotation marks and citation omitted).

[58] *See id.*

[59] *See In re Fordu*, 201 F.3d 693, 703 (6th Cir. 1999); *Quadrozzi Concrete Corp. v. City of New York*, No. 03 Civ. 1905, 2004 WL 2222164, at *4 (S.D.N.Y. Sept. 30, 2004).

-19-

valid and final judgment on the merits.[60]

## C.   Personal Jurisdiction

The determination of whether a federal court has personal jurisdiction over a defendant is a two-step process. *First*, the court must determine whether the plaintiff has shown that the defendant is subject to personal jurisdiction under the forum state's laws.[61] *Second*, the court must assess whether its assertion of jurisdiction pursuant to the forum state's laws comports with the requirements of due process.[62]

### 1.   New York Law

In New York, sections 301 and 302(a) of the New York Civil Practice Law and Rules ("C.P.L.R.") set forth the relevant law.

---

[60]   *N.L.R.B. v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999) (quotation marks and citation omitted). *See also Boone v. Spurgess*, No. 03 Civ. 3841, 2004 WL 2211610 (6th Cir. Oct. 4, 2004) (noting that under Ohio law "[t]he doctrine of issue preclusion . . . holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different.") (quotation marks and citation omitted).

[61]   *See Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997); *Met Life*, 84 F.3d at 567.

[62]   *See Bensusan*, 126 F.3d at 27; *Met Life*, 84 F.3d at 567.

-20-

### a.    General Jurisdiction

Under section 301of the C.P.L.R., New York subjects a foreign corporation to general jurisdiction if it is "doing business" in the state.[63]  Under this test, "a foreign corporation is amenable to suit in New York if it is 'engaged in such a continuous and systematic course' of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction."[64]  That is, a "corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action . . . if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'"[65]  "The doing business standard is a stringent one because a corporation which is amenable to the Court's general jurisdiction may be sued in New York on causes of action wholly unrelated to acts done in New York."[66]

To determine whether a foreign corporation is doing business in New

---

[63]    *See* N.Y. C.P.L.R. § 301 (McKinney 2003).

[64]    *Aerotel Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 191-92 (S.D.N.Y. 2000) (quoting *Frummer v. Hilton Hotels Int'l Inc.*, 19 N.Y.2d 533, 536 (1967)).

[65]    *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985)).

[66]    *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001) (quotation marks and citations omitted).

York, courts focus on a traditional set of indicia:  (1) whether the company has an

office in the state; (2) whether it has any bank accounts or other property in the

state; (3) whether it has a phone listing in the state; (4) whether it does public

relations work in the state; and (5) whether it has individuals permanently located

in the state to promote its interests.[67]   However, these factors are only intended to

provide guidance — they do not amount to a "formula" for testing jurisdiction.  As

the Second Circuit has noted, "[t]here is no talismanic significance to any one

contact or set of contacts that a defendant may have with a forum state; courts

should assess the defendant's contacts *as a whole*."[68]

      **b.**     **Specific Jurisdiction**

          **i.**     **Section 302(a)(1)**

Under section 302(a)(1),[69] a court may exercise personal jurisdiction

---

[67]     *See Wiwa*, 226 F.3d at 98 (citing *Hoffritz*, 763 F.2d at 58; *Frummer*, 19 N.Y.2d at 537).

[68]     *Met Life*, 84 F.3d at 570 (emphasis in original).  *See also Landoil Res. Corp. v. Alexander & Alexander, Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) ("The Court must [] analyze a defendant's connections to the forum state 'not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York.'") (quoting Weinstein, Korn & Miller, New York Civil Practice, ¶ 301.16, at 3-32).

[69]     Section 302(a)(1) reads, in relevant part:  "[A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent transacts any business within the state or contracts anywhere to supply

over a nondomiciliary if "the nondomiciliary [] transact[s] business within the

state, [and] the claim against the nondomiciliary [] arise[s] out of that business

activity."[70]  "A nondomiciliary 'transacts business' under C.P.L.R. 302(a)(1) when

he 'purposefully avails himself of the privilege of conducting activities within

New York, thus invoking the benefits and protections of its laws.'"[71]  A court's

determination of whether a defendant "transacts business" in New York is based

on an assessment of the sum of the defendant's activities.[72]

### ii.    Section 302(a)(2)

Under section 302(a)(2), personal jurisdiction over a non-domiciliary

---

goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1) (McKinney 2003).

[70]    *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).
Because jurisdiction under section 302(a)(1) requires consideration of whether a
cause of action arose out of a party's transaction of business in New York, it is
necessary to "determine the issue of personal jurisdiction separately for each cause
of action asserted in the plaintiff's complaint."  *Cosmetech Int'l LLC v. Der Kwei
Enter. & Co.*, 943 F. Supp. 311, 317 (S.D.N.Y. 1996).  *See also Ainbinder v.
Potter*, 282 F. Supp. 2d 180, 184 (S.D.N.Y. 2003).

[71]    *CutCo Indus.*, 806 F.2d at 365 (quoting *McKee Elec. Co. v.
Rauland-Borg Corp.*, 20 N.Y.2d 377, 382 (1967)) (alterations omitted).  *See also
Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000) ("[T]he statute
allows jurisdiction only over a defendant who has purposefully availed himself of
the privilege of conducting activities within New York and thereby invoked the
benefits and protections of its laws.") (quotation marks and alteration omitted)).

[72]    *See Sterling Nat'l Bank & Trust Co. of N.Y. v. Fidelity Mortgage
Investors*, 510 F.2d 870, 873 (2d Cir. 1975).

-23-

may be asserted over a defendant that "commits a tortious act within the state."[73]
The Second Circuit has interpreted section 302(a)(2) to "require[] that the tortious
act itself physically be performed within New York State."[74]

### iii.    Section 302(a)(3)

Under section 302(a)(3), personal jurisdiction may be asserted over a
non-domiciliary if the non-domiciliary "commits a tortious act without the state"
injuring a person within New York, and either (i) "regularly does or solicits
business, or engages in any other persistent course of conduct," or (ii) derives
substantial revenue from interstate commerce and expects or reasonably should
expect the tortious act to have consequences in the state.[75]  In deciding whether
there is injury in New York sufficient to merit section 302(a)(3) jurisdiction,
courts ordinarily "apply a situs-of-injury test to determine where the original event
that caused the injury occurred.  The situs of the injury is the location of the
original event which caused the injury, not the location where the resultant

---

[73]    N.Y. C.P.L.R. § 302(a)(2) (McKinney 2003).

[74]    *Westvaco Corp. v. Viva Magnetics Ltd.*, No. 00 Civ. 9399, 2002 WL
1933756, at *2 (S.D.N.Y. Aug. 20, 2002).

[75]    N.Y. C.P.L.R. § 302(a)(3) (McKinney 2003).

-24-

damages are felt by the plaintiff."[76]

### c.    Jurisdiction Based on Website Activity

"It is well settled that a court must examine the nature and quality of a defendant's activity on its website to determine whether jurisdiction is appropriate in New York."[77]  Courts assessing whether Internet activity permits the exercise of personal jurisdiction "have identified an array of fact patterns."[78]  At one end of the spectrum are "passive" websites which display, but do not permit an exchange of, information.  "At the other end of the spectrum are cases in which the defendant clearly does business over the Internet . . . .  Occupying the middle ground are 'interactive' websites, which permit the exchange of information between the defendant and website viewers."[79]

"Most courts considering the significance of internet activity for the

---

[76]    *Neewra, Inc. v. Manakh Al Khaleej Gen. Trading and Contracting Co.*, No. 03 Civ. 2936, 2004 WL 1620874, *6 (S.D.N.Y. July 20, 2004) (quotation marks and citations omitted).  Accordingly, "[t]he occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York." *Id.* (quotation marks and citations omitted).

[77]    *Alpha Int'l, Inc. v. T-Reprods., Inc.*, No. 02 Civ. 9586, 2003 WL 21511957, at *3 (S.D.N.Y. July 1, 2003) (citing *Mattel, Inc. v. Adventure Apparel*, No. 00 Civ. 4085, 2001 WL 286728, at *3 (S.D.N.Y. Mar. 22, 2001)).

[78]    *Hsin Ten*, 138 F. Supp. 2d at 456.

[79]    *Id.* (citations omitted).

exercise of personal jurisdiction have done so in the context of a specific, rather than general, jurisdictional analysis."[80]  Thus, while a defendant's use of an interactive website, standing alone, may support a finding of specific jurisdiction,[81] it generally will not confer general jurisdiction over a defendant.[82]

## 2.    Due Process

The Second Circuit has summarized the due process requirements for exercising personal jurisdiction over a foreign defendant as follows:

> The due process clause of the Fourteenth Amendment permits a state to exercise personal jurisdiction over a non-resident defendant with whom it has certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.  In determining whether minimum contacts exist, the court considers the relationship among the defendant, the forum, and the litigation.
> To establish the minimum contacts necessary to justify specific jurisdiction, the plaintiff first must show that his claim arises out of or relates to defendant's contacts with the forum state.  The plaintiff must also show that the defendant purposefully availed himself of the privilege of doing business in the forum state and that the

---

[80]    *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 570-71 (S.D.N.Y. 2000).

[81]    *See, e.g., Alpha Int'l, Inc.,* 2003 WL 21511957, at *3; *Zippo Mfg. Co. v. Zippo Dot Com,* 952 F. Supp 1119, 1124 (W.D. Pa. 1997); *Hsin Ten,* 138 F. Supp. 2d at 456.

[82]    *See, e.g., Kaprun Siemens Austria*, 230 F. Supp. 2d at 408.

> defendant could foresee being haled into court there.
> If the plaintiff satisfies these requirements, the court
> also considers whether the assertion of jurisdiction
> comports with traditional notions of fair play and
> substantial justice — that is, whether it is reasonable
> under the circumstances of a particular case.[83]

There are two components to the inquiry: *first* the court must determine whether

the defendant has sufficient contacts with the forum state to justify the court's

exercise of personal jurisdiction, and *second*, the court must determine whether the

assertion of personal jurisdiction is reasonable under the circumstances of the

particular case.[84] The two prongs are interrelated, such that a weak showing of

minimum contacts requires a stronger demonstration of reasonableness.[85] "On the

other hand, where a defendant who purposefully has directed his activities at

forum residents seeks to defeat jurisdiction, he must present a compelling case that

the presence of some other considerations would render jurisdiction

unreasonable."[86]

Once the plaintiff has demonstrated the requisite minimum contacts

---

[83]     *Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998) (alterations, citations, and quotation marks omitted).

[84]     *See Met Life*, 84 F.3d at 567-68 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[85]     *See id.* at 568-69.

[86]     *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

-27-

between the defendant and the forum state, the court must employ a five-factor test

to determine whether the assertion of personal jurisdiction is reasonable.[87]  These

factors are:  (1) the burden that the exercise of jurisdiction will impose on the

defendant; (2) the interests of the forum state in adjudicating the case; (3) the

plaintiff's interest in obtaining convenient and effective relief; (4) the most

efficient resolution of the controversy; and (5) the interests of the state in

furthering substantive social policies.[88]

## III.    DISCUSSION

### A.    Subject-Matter Jurisdiction[89]

---

[87]    *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987); *Met Life*, 84 F.3d at 573.

[88]    *See Asahi*, 480 U.S. at 112; *Burger King*, 471 U.S. at 476-77.

[89]    A federal court may not "hypothesize subject-matter jurisdiction for the purpose of deciding the merits." *Batista v. INS*, No. 99 Civ. 2847, 2000 WL 204535, at *2 (S.D.N.Y. Feb. 22, 2000).  Thus, although the "merits" present relatively straightforward issues, this Court must first grapple with the jurisdictional arguments.

> [I]n most instances subject-matter jurisdiction will involve no arduous inquiry.  In such cases, both expedition and sensitivity to state courts' coequal stature should impel the federal court to dispose of that issue first. . . .  [H]owever, [if] a district court has before it a straightforward personal jurisdiction issue presenting no complex question of state law, and the alleged defect in subject-matter jurisdiction raises a difficult and novel question, the court does not abuse its discretion by turning directly to

-28-

M/I Homes contends that this Court lacks jurisdiction over the subject matter of this action because: Sarah's claims are "inextricably related to matters of domestic relations — an area in which federal courts have long refrained from asserting jurisdiction," and "habeas corpus relief is unavailable to challenge child custody decisions."[90] M/I Homes's first argument could be construed in two ways:

----

personal jurisdiction.

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587-88 (1999) (citations omitted). As the challenge to subject-matter jurisdiction does not raise a difficult or novel question, nor is the personal jurisdiction inquiry straightforward, I begin with subject-matter jurisdiction.

[90]    8/23/04 Memorandum in Support of Defendant M/I Homes' Motion to Dismiss at 12. Sarah's petition for habeas corpus relief for her sisters must be dismissed on several grounds. *First*, for the reasons stated in Part III.B, there is no personal jurisdiction over Mr. Schottenstein (the alleged "custodian"), in New York as to this claim. *Second*, there are serious questions as to Sarah's standing to seek this relief, as she has neither satisfied the elements of constitutional standing, *see American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 03 Civ. 6913, 2004 WL 1794495, at *7 (S.D.N.Y. Aug. 10, 2004) (discussing the requirements for Article III standing, *i.e.*, (1) injury in fact, (2) causation, and (3) redressability), nor adequately demonstrated the propriety of her status as the "next friend" of her sisters, *see Whitmore v. Arkansas*, 495 U.S. 149, 163-64 (1990) (noting that "next friend" status is "by no means granted automatically to whomever seeks to pursue an action on behalf of another," but requires that the petitioner (1) "provide an adequate explanation . . . why the real party in interest cannot appear on [her] own behalf" and (2) "must be truly dedicated to the best interests of the person on whose behalf [she] seeks to litigate."). *Third*, the Supreme Court has stated that section 2254 "does not confer federal-court jurisdiction" over matters involving the custody of children. *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 515-16 (1982). *Fourth*, the Supreme Court's decision in *Rumsfeld v. Padilla*, 124 S. Ct. 2711, 2724 (2004),

the domestic relations exception deprives this Court of diversity jurisdiction of

this action or, under the Rooker-Feldman doctrine, this Court lacks authority to

review the final custody determination rendered by the Ohio courts.[91]

### 1.    Domestic Relations Exception

For the reasons that follow, the domestic relations exception does not

preclude the exercise of subject-matter jurisdiction over the claims asserted in the

Amended Complaint.  None of these claims (with the exception of Count 7,

seeking habeas relief) seek the issuance or modification of an existing custody

order.  Instead, they are presented, albeit in a rather slapdash manner, as tort

claims.  Accordingly, this Court is not deprived of subject-matter jurisdiction by

_____

makes clear that applications for habeas relief must be filed in the district in which
the habeas petitioner is being held (here, Ohio).  Based on the foregoing, it is quite
obvious that Sarah's petition for habeas relief is premised on a fundamental
misunderstanding of the law and must be dismissed.

[91]    To the extent that this Court's jurisdiction is not based on the
diversity statute, the domestic relations exception does not operate as a limitation
on the Court's authority to adjudicate this dispute.

M/I Homes's argument suggests that this Court should abstain from
asserting jurisdiction because Sarah's claims contain "elements" of a domestic
relationship and presents difficult questions of state law bearing on important
policy problems.  However, the questions presented by the Amended Complaint
are not complex, nor was this suit filed prior to the effectuation of a child custody
decree.  *See Elk Grove Unified Sch. Dist.*, 124 S. Ct. at 2309.  Accordingly,
judicial abstention is not warranted.

-30-

the domestic relations exception.

### 2.    Rooker-Feldman Doctrine

The claims asserted in this action were not, nor could they have been, raised in the prior custody proceedings and hence, they are not barred under principles of res judicata. As for collateral estoppel, most of the issues raised in this action were not actually and necessarily litigated in the earlier action. Indeed most of these averments are based on conduct alleged to have occurred after Mr. Schottenstein had already been awarded custody by the Ohio courts.

However, insofar as Sarah's so-called "Fourteenth Amendment" claim ("Count Three" of the Amended Complaint) is premised on the "State of Ohio, at Defendant's behest, [having] deprived Sarah . . . of her liberty and privacy interests by forcing her to live away from her mother whom she adores,"[92] it is barred under the Rooker-Feldman doctrine. Sarah's interest in living with her mother is an issue that was actually and necessarily decided by the Ohio courts. Indeed, whether the Schottenstein daughters' placement with their father was in

---

[92]    Am. Compl. ¶ 32. Sarah adds that Count Three is also based on her placement in various institutions by her father while she was in his custody. Because it is not clear that the requirements of Rooker-Feldman are satisfied by the proceedings underlying the court orders pursuant to which Sarah was confined in these facilities, this issue is not barred.

their best interests was the central consideration in the prior custody proceedings.[93]

**B.    Personal Jurisdiction**

**1.    Mr. Schottenstein's Motion**

Mr. Schottenstein seeks dismissal of this action for lack of personal jurisdiction. Sarah argues that this Court has jurisdiction over her father under both sections 301 and 302.

**a.    New York Law**

**i.    Section 301**

Sarah contends this Court has "general jurisdiction" over Mr. Schottenstein because he "regularly trades his own stock on the New York Stock Exchange. He is believed to bank in New York. He travels to and through New York on business."[94] As a threshold matter, I note that "New York courts do not agree on whether a natural person may be subject to 'doing business' jurisdiction under Section 301."[95] I need not resolve this issue because Sarah has not made a

---

[93]    *See generally* Final Custody Order.

[94]    Pl. Schottenstein Opp. at 2.

[95]    *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392 n.115 (S.D.N.Y. 2002), *aff'd*, No. 03 Civ. 7897, 2004 WL 2155390 (2d Cir. Sept. 27, 2004). *Accord Tyco Int'l Ltd. v. Walsh*, No. 02 Civ. 4633, 2003 WL 553580, at *3 (S.D.N.Y. Feb. 27, 2003).

-32-

*prima facie* showing that Mr. Schottenstein was "doing business" in New York for

the reasons that follow.

        Sarah does not allege and Mr. Schottenstein appears to lack, most of

the traditional indicia associated with "doing business" in New York.[96]

Specifically, Sarah does not aver that Mr. Schottenstein maintains a New York

office or has any property or a phone listing in the state.  Although failure to allege

these facts, by itself, does not mean that jurisdiction under section 301 is lacking,

Sarah fails to provide *any* basis upon which to infer that Mr. Schottenstein is

"doing business" in New York.  Even if true, Sarah's jurisdictional allegations

regarding Mr. Schottenstein — that he regularly trades his stock on the New York

Stock Exchange, and  travels "to and through" New York on business[97]— do not

suggest that Mr. Schottenstein conducts business in New York with any regularity,

and certainly not on a systematic and continuous basis.  Accordingly, Sarah offers

---

[96]     Although Sarah argues that Mr. Schottenstein is "believed to" use a New York bank, this allegation is insufficient, standing alone, to confer general jurisdiction over Mr. Schottenstein.

[97]     *See, e.g.*, *Celi v. Canadian Occidental Petroleum Ltd.*, 804 F. Supp. 465, 468 (E.D.N.Y. 1992) (rejecting argument that Canadian defendant is doing business in New York because its stock is traded on the American Stock Exchange in New York); *Landoil Res. Corp.*, 918 F.2d at 1044 (finding that sporadic business trips of short duration were insufficient to establish employer's systematic and continuous presence in New York).

no basis upon which this Court can exercise jurisdiction over Mr. Schottenstein

under section 301.

### ii.      Section 302(a)(1)

Sarah contends that Mr. Schottenstein transacts business in New York

because he "regularly and recently has sold a considerable number of shares in his

own company, M/I Homes, which is listed on the New York Stock Exchange,

resulting in substantial revenue."[98]  Sarah further alleges that Mr. Schottenstein

has "commit[ted] tortious acts within New York by selling $400,000 of securities

through Salomon Smith Barney, New York brokerage firm that belonged to

Sarah."[99]  Mr. Schottenstein offers an affidavit in which he claims that he does not

transact business in New York.  He does not, however, specifically refute these

jurisdictional allegations.[100]

There is no nexus between these "contacts" and Sarah's claims for

false imprisonment, invasion of privacy, various constitutional violations,

---

[98]      Pl. Schottenstein Opp. at 6.

[99]      *Id.*  Sarah erroneously implies that this and other alleged
jurisdictional contacts relate only to sections 302(a)(2) and (3), rather than section
302(a)(1).  *See id.*

[100]      8/19/04 Affidavit of Steven Schottentstein, Ex. A to Schottenstein
Mem., ¶ 10.

intentional infliction of emotional distress, or habeas corpus. The circumstances

from which each of those claims arose lack any connection to this forum.

However, crediting as true Sarah's allegations that Mr. Schottenstein regularly

sells a considerable number of shares on the New York Stock Exchange using an

active New York account[101] and that her cause of action for conversion, restitution,

and accounting arose from one such stock sale, she has made an adequate *prima*

*facie* showing that this Court has jurisdiction over Mr. Schottenstein *solely* as to

this claim.[102]

---

[101]    It is not entirely clear that Mr. Schottenstein regularly uses a New York account to undertake stock transactions; however at this stage in the proceedings, it is appropriate to construe the facts in Sarah's favor.

[102]    *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999) ("Plaintiff alleged that defendants held an 'active account' with plaintiff's firm in New York . . . and that they agreed to sell plaintiff various securities through that account in a series of transactions . . . that are the basis of the suit. . . . [T]hese facts, if true, would be sufficient to establish personal jurisdiction over defendants under § 302(a)(1)."); *Picard v. Elbaum*, 707 F. Supp. 144, 146-49 (S.D.N.Y. 1989) (discussing New York case law conferring jurisdiction over non-domiciliaries that maintain ongoing investment accounts in New York and direct the sale of securities in New York).

Sarah's opposition papers also contain vague allegations regarding a conversion claim premised on the court-authorized transfer by Paine Webber of approximately $13,000 from her mother's custodianship into an account under her father's control. Pl. Schottenstein Opp. at 6. But assuming that these averments are true, there is no jurisdiction over Mr. Schottenstein as to this claim under section 302(a)(1). As articulated by Sarah, this conversion claim does not arise out of the court-ordered transfer of the funds out of New York and into Mr.

### iii.    Sections 302(a)(2)-(3)[103]

Sarah has failed adequately to demonstrate that jurisdiction over Mr.

Schottenstein is proper under either section 302(a)(2) or 302(a)(3).  She claims

that he has committed a tortious act without the state causing injury to her, a

person within the state, by interfering with her health care and sending her

"emails, letters by mail, and also Airborne deliveries after commencement of this

case without going through her retained counsel."[104]  None of this conduct

amounts to a "tortious act" for purposes of the long-arm statute.  Moreover, it

bears no relevance to Sarah's claims.

### b.    Due Process

For the foregoing reasons, Mr. Schottenstein has the requisite

minimum contacts with New York.  Crediting Sarah's averments as true, he

purposefully availed himself of the benefits of the forum by maintaining an

---

Schottenstein's custodianship, but rather stems from her father's subsequent
refusal to allow her access to this money upon her reaching the age of majority.
Accordingly, the operative jurisdictional contacts are with Ohio, not New York.

[103]    This section relates only to Sarah's claims for false imprisonment,
invasion of privacy, various constitutional violations, intentional infliction of
emotional distress, or habeas corpus.

[104]    Pl. Schottenstein Opp. at 6.

-36-

account and selling stock in New York. Under the five-factor *Asahi* test,[105] it is

reasonable for this Court to assert jurisdiction over Mr. Schottenstein.

      *First*, although there may be some difficulties associated with

requiring him to defend this suit in New York because he is an Ohio resident, the

"conveniences of modern communication and transportation ease what would have

been a serious burden only a few decades ago."[106] Thus, this factor favors Sarah.

*Second*, New York has some interest in this litigation. Based on the current

record, the details underlying the alleged conversion are murky, but it is

reasonable to assume that if he orchestrated the sale of Sarah's securities through a

New York brokerage account, his behavior has some connection to this forum.

This factor tips in favor of Sarah. *Third*, Sarah undoubtedly has a strong interest

in litigating this action in New York. *Fourth*, in determining whether adjudication

in the forum state would promote the efficient administration of justice, courts

consider where witnesses and evidence are likely to be located.[107] The potential

---

[105]    *See* 480 U.S. at 107.

[106]    *Met Life*, 84 F.3d at 574. *See also Burger King*, 471 U.S. at 483
(noting that inconvenience must be "substantial [] to achieve *constitutional*
magnitude) (emphasis in original). That Mr. Schottenstein regularly uses the M/I
Homes jet to travel around the country strongly suggests the inconvenience, if any,
raised by his involvement in legal proceedings in New York, is *de minimus*.

[107]    *See Met Life*, 84 F.3d at 574.

witnesses are located in Ohio and possibly New York.  Moreover, documentary

evidence is likely located in both jurisdictions.  As such, this factor is neutral.

*Fifth*, the parties have not argued, and I cannot discern any substantive social

policies that would be furthered by permitting this case to be heard in New

York.[108]  In sum, the "reasonableness" inquiry favors the assertion of jurisdiction

in New York.

### 2.    M/I Homes's Motion

#### a.    Section 301

The parties do not dispute that M/I Homes lacks all of the indicia

ordinarily associated with "doing business" in New York.  That is, M/I Homes has

no office, telephone number, mailing address, bank account, or other property in

New York.  Moreover, it does not have any employees residing or stationed in the

state.[109]  However, Sarah alleges that M/I Homes maintains an interactive website

through which it solicits business in New York and earns 20% of its revenues

from sales to New York residents.[110]  M/I Homes does not refute these allegations,

noting only that it "does not conduct, operate, engage in, or carry on any

---

[108]    *See id.* at 575.

[109]    *See* Mason Aff. ¶¶ 5-7.

[110]    *See* Sarah Dec. ¶¶ 3-4.

-38-

continuous or substantial business in the State of New York"[111] and that its website is not "oriented toward New York consumers in any way."[112]

The M/I Homes website is neither a passive, nor highly interactive website. That is, M/I Homes does more than simply advertise on its Internet site; it also permits users to exchange information with the company; view sample homes in neighborhoods in Ohio, Florida, Indiana, North Carolina, Washington D.C., Maryland, and Virginia; and use an interactive financial calculator, enabling them to determine how much they can afford to spend on the purchase of a home.[113] The website also provides a means for the user to contact a customer representative. Crediting Sarah's jurisdictional averments as true, this website has enabled M/I Homes to generate 20% of its revenues from New York residents. At this early stage in the proceedings, Sarah has adequately pled that there is general jurisdiction over M/I Homes due to its interactive website advertising plus substantial sales to New York residents.[114]

---

[111]    Mason Aff. ¶ 4.

[112]    *Id.* ¶ 9.

[113]    *See* www.mihomes.com, Ex. A to Sarah Dec.

[114]    By contrast, where the total amount of revenue derived from customers in New York is, for instance, 5% or less of a foreign defendant's revenues, courts in this district have found that the foreign defendant is not "doing business" in New York. *See, e.g., Hutton v. Priddy's Auction Galleries, Inc.*, 275

### b.    Due Process

The exercise of personal jurisdiction over M/I Homes does not offend

due process.  For the foregoing reasons, M/I Homes has the requisite minimum

contacts with New York.  Construing the allegations in Sarah's favor, M/I Homes

purposefully availed itself of the benefits of doing business in this forum such that

it could reasonably foresee being haled into a New York court.  Under the *Asahi*

test, the exercise of personal jurisdiction over M/I Homes is reasonable.[115]

### C.    Failure to State a Claim

---

F. Supp. 2d 428, 437 (S.D.N.Y. 2003) ("While PAG has sold goods to New York
buyers, such sales amount to under $40,000, or less than 3% of PAG's total
revenue for the last three years.  Such a small amount of revenue derived from
New York customers is insufficient to support a finding that the foreign company
is doing business in New York."); *id.* at 437-38 (citing cases finding no general
jurisdiction over defendants with sales of 5% and 2.8% to New York consumers);
*Stemcor USA, Inc. v. Sharon Tube Co.*, No. 00 Civ. 9186, 2001 WL 492427, at *2
(S.D.N.Y. May 8, 2001) (noting that "Section 301 does not lie where the total
amount of sales in New York each year constitutes 4%, or $400,000, of total sales"
and holding that where sales to New York customers accounted for less than 1%
of sales, there was no general jurisdiction over the foreign defendant); *id.* (citing
cases standing for proposition that sales to New York customers of 3%, 1.3%, 1%,
or less than 1% fails to satisfy section 301).

[115]    *First*, the burden imposed on M/I Homes to defend a suit in New
York is minimal.  *Second*, New York likely has some interest in this litigation.
*Third*, Sarah has a strong interest in litigating this action in New York.  The fourth
factor tips slightly in M/I Homes's favor, as most of these claims could be more
efficiently resolved in Ohio and the fifth factor is neutral.  Accordingly, it cannot
be said that the exercise of jurisdiction over M/I Homes is unreasonable.

### 1.   Mr. Schottenstein's Motion

The only claim over which this Court may assert both subject-matter (diversity jurisdiction) and personal jurisdiction (under the long-arm statute) is the conversion claim.[116] "The essence of the tort of conversion is not the acquisition of the property but rather the wrongful deprivation of another's property."[117]   A plaintiff seeking to recover on a claim for conversion must aver that:  (1) she "had a legal ownership interest or an immediate superior right of possession to the property" and (2) "the defendant exercised unauthorized interference with the plaintiff's ownership or possession of the property."[118]   Specifically, a "plaintiff[] must allege that a demand for the return of property was made and that a refusal to comply with this demand followed."[119] Although the Amended Complaint fails to mention a demand for the return of property, Sarah alleges that she is in "need of

---

[116]   Moreover, dismissal for improper venue as to this claim is not warranted.

[117]   *Rose v. AmSouth Bank of Fla.*, 296 F. Supp. 2d 383, 397 (E.D.N.Y. 2003).

[118]   *Id.  See also Kramer Consulting, Inc. v. McCarthy*, 284 F. Supp. 2d 917, 922 (S.D. Ohio 2003) ("The elements of a conversion claim [under Ohio law] are:  1) plaintiff's ownership or right to possession of the property at the time of the conversion; 2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and 3) damages.").

[119]   *Louros v. Cyr*, 175 F. Supp. 2d 497, 515 (S.D.N.Y. 2001) (quotation marks and citation omitted).  *See also Kramer Consulting*, 284 F. Supp. 2d at 922.

-41-

these funds" and that her father sold the stock for his own use and benefit, "instead

of to hers."[120]  This strongly suggests that she has made a demand for the return of

the money, but to no avail, which is sufficient under the liberal pleading

requirements of Rule 8.

### 2.    M/I Homes's Motion

The claims asserted against M/I Homes must be dismissed for failure

to state a claim.  There is simply no connection between M/I Homes and the

claims asserted in the Amended Complaint.  Sarah contends that M/I Homes had a

duty to control her father and prevent his purportedly tortious conduct toward her;

however, she provides no legal basis for this puzzling conclusion.  Indeed, a

corporation has no obligation to exercise control over its officers with respect to

their activities outside of the scope of employment.  For this reason, Sarah has

failed to state a cognizable claim as to M/I Homes, and this action is dismissed as

to this defendant.[121]

---

[120]    Am. Compl. ¶¶ 42-43.

[121]    Moreover, although Sarah notes that "M/I Homes has breached its
fiduciary duties to its shareholders," Pl. M/I Homes Opp. at 2, she does not assert
any derivative claims against M/I Homes.  Indeed, any such claim would be
fruitless because, under Rule 23.1 of the Federal Rules of Civil Procedure, any
complaint asserting a derivative action "shall . . . allege with particularity the
efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from
the directors or comparable authority and, if necessary, from the shareholders or

## IV.   CONCLUSION

For the reasons set forth above, M/I Homes's motion to dismiss the Complaint is granted.  Mr. Schottenstein's motion to dismiss is granted in part and denied in part.  The motion is granted with respect to all claims except the conversion claim.  The Clerk of the Court is directed to close these motions [# 11 and 14 on the docket sheet].  A conference is scheduled for November 18, 2004, at 3:30 P.M.


SO ORDERED:


Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              November 5, 2004

_____

members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."  The Amended Complaint includes no such allegations.

## - Appearances -

**For Plaintiff:**

Thomas M. Burton, Esq.
5820 Stoneridge Mall, Suite 100
Pleasanton, CA 94566
(801) 918-1656

**For Defendant Steven Schottenstein:**

Barry H. Wolinetz, Esq.
David C. Levine, Esq.
Baker & Hostetler, LLP
65 E. State Street, Suite 2100
Columbus, OH 43215
(614) 462-4705

**For Defendant M/I Holmes Inc.:**

Thomas Edward Riley, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5408